## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID PERRY, | ) | |
|     Plaintiff, | ) | |
| | ) | |
|     v. | ) | Civil Action No.21-11367 |
| | ) | |
| KRISTYN KELLY, JOSEPH | ) | |
| ROSS, JACK LOUIE, | ) | |
| MICHAEL FITZGERALD, | ) | |
| MICHELLE HALLORAN, | ) | |
| TOWN OF READING, and | ) | |
| PATRICK JOHNSON, | ) | |
|     Defendants. | ) | |

### COMPLAINT AND JURY DEMAND

This is a complaint for relief by the Plaintiff, David Perry, as against the Defendants, Assistant Attorney General for the Commonwealth of Massachusetts Kristyn Kelly, State Police Trooper Joseph Ross, State Police Sergeant Jack Louie, State Police Trooper Patrick Johnson, Town of Reading Detective Michelle Halloran, Town of Reading Detective Michael Fitzgerald, and the Town of Reading Massachusetts for violations of the Federal Civil Rights Act and the Massachusetts Civil Rights Act. This Court has personal and subject matter jurisdiction as both the Plaintiff and Defendants are residents and/or located in Massachusetts and this matter concerns claims under the Federal Civil Rights Act.

### **PARTIES**

1.   The Plaintiff, David Perry ("Perry"), is an individual and resident of Massachusetts with a home address of 36 Augustus Court, Reading, MA.

2.   The Defendant, Kristyn Kelly, formerly Kristyn Dusel ("AGG Dusel"), is an Assistant Attorney General for the Commonwealth of Massachusetts and believed to be a resident of Massachusetts living at 1 Reservoir Cir, Braintree, MA 02184.

3.   The Defendant, Joseph Ross ("Ross"), is a State Police Trooper and believed to be a resident Massachusetts.

4.   The Defendant, Jack Louie ("Louie"), is a State Police Sergeant and believed to be a resident of Massachusetts.

5.   The Defendant, Patrick Johnson ("Johnson"), is a State Police Trooper and believed to be a resident of Massachusetts.

6.   The Defendant, Michael Fitzgerald ("Fitzgerald"), is a Detective with the Town of Reading Police Department and believed to be a resident of Massachusetts.

7.   The Defendant, Robert McHugh ("McHugh"), is a Detective with the Town of Reading Police Department and believed to be a resident of Massachusetts.

8.   The Defendant, Michelle Halloran ("Halloran"), is a Detective with the Town of Reading Police Department and believed to be a resident of Massachusetts.

9.   The Defendant, Town of Reading, is a municipality in the Commonwealth of Massachusetts with an address of 16 Lowell St, Reading, MA 01867 and Robert W. LeLacheur, Jr. as Town Manager.


## FACTS

10.  Perry owned and operated Recovery Educational Services, LLC ("RES"), a business that provided sober housing to its residents in recovery from drugs and/or alcohol. RES remained in business from 2006-2018.  In the 12 years of its operation, RES provided sober housing to over 5000 men and women.

11.  Justin Kady ("Kady") resided at RES from October 2012 through June 2014. Kady's residency ended when was discharged in 2014 due to various infractions of the RES "Residency Rules and Regulations".

12.  In June 2016, after 14½ years of sobriety, Perry himself relapsed.  In November 2016, Kady sent a text message to Perry asking if he could "hang out" with Perry on a social basis. Perry accepted Kady's request and invited Kady to join Perry and two (2) of Perry's friends at Perry's condominium on the evening of Friday, November 25, 2016.

13.  Kady socialized with Perry and his friends as an invited guest of Perry on that sole occasion on the evening of November 25, 2016.

14.  Five (5) nights later, on November 30, 2016, Perry arrived home from work at around 7:30 pm. Soon thereafter, Perry walked into his bedroom to find Kady coming out of his bedroom closet thereby catching Kady in the act of breaking into, invading and robbing Perry's home (the "Kady Home Invasion").

15.  Kady stated that he entered the condominium through the ground level balcony slider door "to get out of the rain." Perry checked the slider to find it locked and the carpet dry. After a verbal confrontation with Kady, it became obvious to Perry that Kady was getting increasingly angry and hostile. Kady then fled from the condominium.

16.  Perry reported the home invasion to the Reading Police Department ("RPD") after he determined that the outside bedroom window screen had been removed and that the window had been broken and breached.  Kady invaded Perry's home through the bedroom window.

17.  Reading Police Officer Matthew Orr ("Orr") was the first responder to the scene. Orr investigated Perry's report and in doing so, took approximately 20 photographs of the entire crime scene documenting the evidence of the home invasion from both inside and outside of the condominium.

18.  From the crime scene, Orr contacted Kady via cell phone. Kady denied breaking into the condominium.  Orr informed Kady that he was filing criminal charges against Kady for the break-in, namely "Breaking and Entering in the Nighttime with Intent to Commit a Felony" as well as "Larceny of Property over $250".

19.  Orr then prepared a detailed Police Report entitled the "Officer's Formal Report" in which he documented the scene of the crime and his opinion that Kady was "not telling the truth" throughout their entire cellphone conversation.

20.  On December 1, 2016, an Application for Criminal Complaint was filed in Woburn District Court ("Woburn Court"), charging Kady with "Breaking and Entering in the Nighttime with Intent to Commit a Felony" & "Larceny of Property over $250" (the "Kady Criminal Complaint").

21.  The Woburn Court issued a Notice of Magistrate's Hearing on Criminal Complaint on December 13, 2016, scheduling the Clerk Magistrate's Hearing on that Kady Criminal Complaint to take place on January 24, 2017.

22.   Kady then contacted Reading Police Prosecutor Michael Fitzgerald ("Fitzgerald") to deny that he broke into Perry's home. Kady then made a series of unrelated accusations against Perry. Fitzgerald then scheduled an interview with Kady.

23.   On January 24, 2017, Police Prosecutor Fitzgerald attended the 1st Criminal Clerk's Hearing before the Woburn Court Clerk Magistrate at 11:00 am.

24.   Kady failed to appear at this Clerk's Hearing.  Instead of defaulting Kady and asking the Court to issue the Complaint, Fitzgerald asked that the Clerk's Hearing be continued to February 22, 2017.

25.   On January 26, 2017, Kady attended Interview #1 with Fitzgerald during which he lied 22 times when he denied playing any role in the Kady Home Invasion.  Kady then made elaborate "accusations" against Perry in an effort to deflect away from his own criminal culpability for the crimes he committed in the "Kady Home Invasion."

26.   Shortly thereafter, Fitzgerald contacted Assistant Attorney General Kristyn Kelly (formerly Kristyn Dusel, referred to herein as "AAG Dusel") and requested that AAG Dusel join Fitzgerald in a new investigation into Perry's actions based solely upon the accusations made by Justin Kady (the "Perry Investigation").

27.   On February 14, 2017, Kady attended Interview #2 with AAG Dusel and Fitzgerald during which he lied 14 times when he denied playing any role in the Kady Home Invasion.  Kady also made several accusations which were the catalyst of the Perry Investigation.

28. Despite being given his Miranda Warnings, Kady was reassured by Fitzgerald that he was "not the target" of their investigation.

29.   On February 22, 2017 and March 7, 2017, RPD, Fitzgerald and/or AAG Dusel failed to provide all the evidence of the Kady Home Invasion at the probable cause Clerk Hearings held at the Woburn Court. Most importantly the photographs taken by Orr of the crime scene were never presented to the Clerk.

30.   On March 7, 2017, the criminal charges against Kady for the Kady Home Invasion were "dismissed" as a result of the actions and/or inaction of AAG Dusel and/or Fitzgerald in not producing

to the Woburn Court inculpatory evidence of Kady's crimes, coupled with Kady perjuring himself before the Woburn Court Clerk. The criminal complaint filed against Kady was dismissed on March 7, 2017 for what Fitzgerald said was "No PC Found at the Clerk's Level."

31.  On March 8, 2017, Halloran, independently or at the direction of AGG Dusel and/or Fitzgerald, destroyed the "B&E/Larceny Photos" contained in the RPD evidence locker, that were never presented to the Court at the Kady probable cause hearings.

32.  The destruction of the B&E/Larceny Photos violated Massachusetts public record retention laws and violated Perry's civil rights.

33.  With AAG Dusel's knowledge, Fitzgerald operated in a conflicted role, as AAG Dusel's lead investigator, investigating Perry's activities, while at the same time "feigning" his pursuit of criminal charges against Kady in his role as "Police Prosecutor."

34.  On December 21, 2017, Kady was called by AAG Dusel to testify before the grand jury as to Perry.

35.  On December 21, 2017 Kady attended Interview #3 with AAG Dusel, Johnson and McHugh, (prior to testifying before the grand jury), and voluntarily confessed that he did break into, invade and rob Perry's home just as Perry reported on December 1, 2016.

36.  Through his confession on December 21, 2017, Kady confirmed that he: 1) lied to law enforcement 52 times on 6 occasions and 2) committed perjury before the Woburn Court to avoid prosecution for the Kady Home Invasion charges. Even with Kady's confession to committing the Kady Home Invasion, AAG Dusel continued to protect Kady's "credibility" as a witness against Perry.

37.  AAG Dusel, Johnson, and McHugh, failed to inform Perry that Kady admitted to the Kady Home Invasion and other crimes against Perry.

38.  Neither AAG Dusel, nor Fitzgerald, ever notified Perry that the "Kady Home Invasion" Complaint was dismissed for lack of probable cause. Perry's rights as a victim of a home invasion were violated at the hands of the RPD, Halloran, AAG Dusel and/or Fitzgerald in "sandbagging" the case against Kady and

destroying evidence to protect Kady's credibility as a witness against Perry.

39.  In addition to confessing commission of the Kady Home Invasion, Kady also confessed to committing six (6) additional crimes against Perry from 2014-2016 during the course of Interview #1 to Fitzgerald and Interview #2 to AAG Dusel and Fitzgerald.

40. By the close of Interview #2, Kady informed AAG Dusel and/or Fitzgerald that he committed six (6) other crimes against Perry beyond the Kady Home Invasion, all of which are listed below:

1. Breaking and Entering into Perry's Business Office at RES
2. Breaking and Entering into Perry's RES Safe
3. Larceny of All Digital Information stored and kept on file on Perry' RES Computer
4. Larceny of All Digital Information stored and kept on file on Perry's Personal Computer
5. Larceny of the several RES "Residency Letters"
6. Larceny over $250 when Kady stole the valuables from Perry's RES Safe

41.  Amongst these six (6) crimes was one involving the theft of Perry's electronic files and property and the theft of personal and confidential information as to each individual RES Resident.

40.  AAG Dusel and/or Fitzgerald were the top law enforcement officials and/or supervisors of the Perry Investigation.  As such, AAG Dusel and/or Fitzgerald were responsible for overseeing every aspect of that investigation.

42.  As early as February 2017, the Investigative Team included, AAG Dusal, Fitzgerald, the RPD, Johnson, and the Massachusetts State Police.

43.  In early March 2017, Fitzgerald summarized in writing the results of his and AAG Dusel's combined efforts investigating the Kady Home Invasion and that of the Perry Investigation up to that point in time.

44.  Fitzgerald's written summary confirmed: all of Kady's many statements denying his involvement in the Kady Home Invasion; that the "Perry Investigation" began on January 24, 2017;

his summary was the first known official report generated as a result of AAG Dusel's and Fitzgerald's combined efforts in reporting on the Kady Home Invasion and the Perry Investigation; identified Kady as Perry's sole accuser; identified Kady as the only witness, whose name was referenced in the Fitzgerald's summary 274 times; memorialized the "statements" Kady made during both of Kady's interviews on January 26, 2017 and February 14, 2017; confirmed Kady's importance as AAG Dusel's lead witness in her pursuit of charges against Perry and confirmed that the "investigation" remained ongoing.

45.  AAG Dusel provided false and misleading information to Perry when responding to a request made by Perry seeking:

> 1) Information regarding any contact Kady had with the Commonwealth from November 30, 2016 to December 21, 2017,
> &
> 2) Information regarding the "*crime spree*" AAG Dusel told Perry that Kady embarked upon in March 2017, after AAG Dusel and/or Fitzgerald orchestrated the "dismissal" of the Kady Home Invasion charges on March 7, 2017.

when she provided inaccurate information about Kady's "*crime spree*" and then purposely misled Perry when she provided Perry with:

> 1) incorrect dates as to when Kady met with FBI.
> 2) incorrect dates as to when Kady was newly arrested.
> 3) incorrect dates as to when Kady was arraigned.

46.  On January 17, 2018, Perry made a request to the RPD for the "Officer's Formal Report", witness statements and photographs generated by the RPD from its investigation of the Kady Home Invasion.

47.  On January 19, 2018, Perry received a response from the RPD, through its Records Access Officer Abate,("RAO Abate"), informing Perry that some of the records requested were no longer in the "possession, custody or control" of the RPD.

48.  On April 10, 2018, Perry filed an Appeal with the Division of Public Records to determine whether the proper standards were followed by the RPD and AAG Dusel regarding the "Retention of Records Schedules" and "Destruction of Records Schedules" by the RPD.

49.  On April 30, 2018, Rebecca Murray, Supervisor of Records for the Commonwealth's Public Records Division, "ORDERED" the following: "The [Reading Police] Department is hereby ORDERED to provide Mr. Perry with a response to the request, explaining justification under the Public Records Law and the schedule for destroying the records, in a manner consistent with this Order, the Public Records Law, and its regulations within ten business days.  A copy of any such response must be provided to this office."

50.  On May 8, 2018, RAO Abate responded that the RPD did destroy records, but he then ignored Supervisor Rebecca Murray's "Order" requiring him to explain whether the records were destroyed in "a manner consistent" with the Division of Public Record Destruction Schedule" guidelines.

51.  Perry learned on or after May 8, 2018 that the B&E/Larceny Photos taken by Orr were never accessed for use at the Clerk's probable cause hearings and that they had been destroyed on March 8, 2017.

52.  To date, the RPD has not provided any evidence of their compliance with the Division of Public Records "Retention of Records Schedule" guidelines or their "Destruction of Records Schedule" guidelines.

53.  As early as May 17, 2017, AAG Dusel knew Perry was a licensed Massachusetts Attorney with a law practice listed with the BBO as follows: Law Offices of David W. Perry, 2599 Washington Street, Roxbury, MA 02119 (781) 727-9147.

54.  Further, as of May 17, 2017, Perry was a Defendant under Indictment.

55.  While submitting 18 Search Warrant Applications on 18 occasions from March 29, 2017 through November 14, 2017, Johnson and/or AAG Dusel failed to present relevant information, important to Perry's defense, and relevant to the Court's decision to issue the 18 Search Warrants requested against Perry.

56. After failing to present that relevant evidence to the Court, Johnson and/or AAG Dusel then proceeded to mislead the Court and mischaracterize, under oath, the relevant content of the available facts, thereby violating Perry's rights and prejudicing Perry's defenses.

57. AAG Dusel and/or Johnson, requested one (1) Search Warrant for the "Person of David Perry (DOB: 7/23/60)" seeking, *inter alia*, "Electronically Generated...Correspondence and . . . Electronic Communication Devices To Search and SEIZE and EXAMINE for Evidence . . . Including Emails" Contained in the Memory of that Telephone and/or Device."

58. On November 13, 2017, AAG Dusel and/or Johnson requested and received a Search Warrant from Suffolk Superior Court Judge Mary K. Ames for the "Property listed in "Addendum A". . . on the person or in the possession of: David Perry..." That "Property" included: "Books...and electronically generated records... including but not limited to…records, documents correspondence, letters…" and "Electronic communication devices, including but not limited to cell phones…to search therein and SEIZE and EXAMINE for evidence…including…emails…"

59. Pursuant to that Search Warrant, AAG Dusel and/or Johnson seized an "electronic communication device", identified as one "Samsung Galaxy cellular telephone, belonging to David Perry, (DOB: 07/23/1960) assigned telephone number 781-727-9147."

60. The Massachusetts Supreme Judicial Court ("SJC"), issued through the SJC's "Supervisory Powers" concerning the protocols which MUST be followed, *sine qua non,* when AAG Dusel applied for any Search Warrant seeking the "Emails of a Defendant Under Indictment" as specifically set forth by the SJC in the case of Preventative Med. Assocs v. Commonwealth, 465 Mass. 810, (2013).

61. On November 13, 2017, AAG Dusel and/or Johnson violated the specific Orders handed down by the SJC through the Court's "Supervisory Powers" pertaining to any Request made to Seize and Search the "Emails of a Defendant Under Indictment", as Mandated by the SJC resulting in an illegal search and seizure of Perry's property and a violation of Perry's Fourth Amendment Rights.

62. On November 14, 2017, Perry was arrested at 11:45 am in Roxbury, MA and held at the Massachusetts State Police Barracks in Boston, MA for the next 24 hours. Perry was not allowed to make a phone call until after 6:00 pm, about seven (7) hours after his arrest.

63. By Johnson and/or others at his direction, Perry was told the phone system at the Metropolitan State Police Barracks was "down" for the six (6) hours after Perry's arrest.

64.   Johnson and/or those acting on his behalf lied when Perry was told that the phone system was "down," thereby precluding Perry's ability to make a call.

65.   Johnson violated Perry's right to make a timely phone call post-arrest.

66.   At or about 12:15-12:30 pm, within 30 minutes after Perry's arrest, AAG Dusel's "Search Team," which upon information and belief included Patrick Johnson, Joseph Ross and Jack Louie, arrived at 2597 Washington Street, Roxbury, MA and 2599 Washington Street, Roxbury, MA to allegedly secure both properties in anticipation of the arrival of a search warrant.

67.   Immediately upon their arrival, AAG Dusel's "Search Team" conducted a sweep of both buildings and cleared the properties of all RES residents from both 2597 Washington St. and 2599 Washington Street.

68.   By 12:45 pm, ten (10) minutes of the "Search Team's" arrival, all 12-15 RES residents present from both buildings were removed from their homes and instructed to remain outside of the buildings.

69.   The property was "briefly swept" and "secured" by 12:55 pm. Four (4) hours later at about 4:30 pm, the search warrants arrived at both properties and were formally served and left for Perry's review when he returned to the properties.

70.   During the four (4) hours from 12:30 to 4:30 pm, AAG Dusel's "Search Team" was observed entering and exiting both buildings on multiple occasions without search warrants.

71.   Several residents of the RES Sober Houses later reported that they witnessed AAG Dusel's "Search Team" entering, exiting and re-entering both buildings on multiple occasions during the course of that four-hour window from 12:30 pm to 4:30 pm.

72.   On November 14, 2017, at or around 2:30 pm, AAG Dusel and/or Johnson presented five (5) Search Warrant Applications to Superior Court Judge Mary K. Ames for approval, two (2) of which specifically targeted the RES properties located at 2597 & 2599 Washington Streets. Judge Ames issued the search warrants at approximately 2:45 pm. in her own handwriting on the warrant.

73.   Several RES residents witnessed AAG Dusel's "Search Team" searching through the living rooms, kitchens and bedrooms

between 12:30 pm – 4:30 pm, a full 2-4 hours prior to the arrival of the search warrants.

74.  One witness, Nicholas Lukasiak, reported that he observed AAG Dusel's "Search Team" running in and out of the houses like "ants on an anthill" during that entire four-hour period from 12:30 pm – 4:30 pm prior to the arrival of the search warrants to the properties.

75.  Another witness, Sharon Osborne, reported that she observed AAG Dusel's "Search Team" moving in and out of the kitchens, living rooms and the bedrooms of both houses searching through cabinets, closets, dresser drawers and bureaus between the hours of 2:00 pm – 4:30 pm, and prior to the arrival of the search warrants to the properties.

76.  Sharon Osborne also witnessed AAG Dusel's "Search Team" taking pictures of the premises while inside the properties between the hours of 2:00 – 4:30 pm, prior to the arrival of the search warrants.

77.  AAG Dusel's "Search Team" went far outside the scope of the areas Judge Ames authorized to search.  AAG Dusel's "Search Team" was engaged in searching both buildings from within prior to the Search Warrants arriving from the Suffolk Superior Court at about 4:30 pm.

78.  AAG Dusel was aware that the "Law Offices of David W. Perry were located at "2599 Washington Street, Roxbury, MA."

79.  The "Search Warrant" obtained from Suffolk Superior Court Judge Mary K. Ames, authorized the "Search Team" to enter and search "2599 Washington Street, Roxbury, MA," however the search warrant is limited to those areas operated by Recovery Educational Services.

80.  "Recovery Educational Services ("RES")" occupied 2½ floors of the building located at "2599 Washington Street, Roxbury, MA". The RES office was located in the front lobby area of the building immediately upon entering the facility. The "Law Offices of David W. Perry" occupied a separate, securely locked office space located on the back side of the first floor of the building located at "2599 Washington Street, Roxbury, MA".

81.  AAG Dusel and/or her "Search Team" took no precautionary measures to make certain the "Law offices of David W. Perry"

would remain outside the scope of her search and, as such, remain unentered and untouched.

82. AAG Dusel and/or other supervisor's of the Search Team, failed to instruct them that when executing the "Search Warrant" for the "RES" property at "2599 Washington Street, Roxbury, MA" that they were specifically limited to the business of Recovery Educational Services.

83. AAG Dusel and/or her "Search Team" lacked proper training to execute the warrants.

84. AAG Dusel and/or other supervisor's failed to instruct the "Search Team" that the Court provided no authorization to enter, search and seize anything located in the "Law Offices of David W. Perry".

85. On November 14, 2017, AAG Dusel and/or her "Search Team" broke into and entered the "Law Offices of David W. Perry" without first obtaining a search warrant or seeking the Court's authorization to allow entry.

86. As such, AAG Dusel and/or the "Search Team" illegally entered and seized electronic devices located in the "Law Offices of David W. Perry" containing every electronic legal defense file and other privileged information and work product related to Perry's entire law practice.

87. Every one of the electronic devices that AAG Dusel seized contained privileged "attorney-client" communications, e-mail correspondence, work product, trial strategies and research materials on file for Perry's entire legal client base.

88. Perry's law office contained several items that were dispositive of the fact that the "Search Team" had entered a law office, including, but not limited to:

1. 2017 Lawyers Diary and Manual on Perry's desk,
2. Lawyer's Weekly publications
3. Case Law Reference Materials
4. Legal Publications
5. Perry's "Suffolk University Law School Diploma".
6. Physical legal files of over 50 criminal defense clients represented by Perry
7. Research Materials
8. Case Law Summaries

         9. Trial Exhibits, Trial Tactic Materials, Client
            Defense Strategies and
        10.    Extensive privileged "attorney-client"
            communications and "work product"

89.  AAG Dusel and/or the Search Team made it impossible for
Perry to determine which parts of his client defense files
containing privileged "attorney/client" communications and "work
product" had been seized, reviewed, read, copied, breached
and/or otherwise compromised by AAG Dusel and/or the Search
Team, when they performed an unrestricted, warrantless search
and seizure of items located in the "Law Offices of David W.
Perry".

90.  When AAG Dusel and/or the other Defendants illegally seized
the electronic storage devices located inside the "Law Offices
of David W. Perry", they effectively destroyed Perry's ability
to carry on his law practice from that point forward.

91.  Perry lost income from his law practice from that point
forward.

92.  To date, AAG Dusel, Johnson and/or any other Defendant have
made no effort to return Perry's property that AAG Dusel and/or
Johnson and/or Ross and/or Louie took when they illegally
entered, searched and seized items from Perry's law office.

93.  AAG Dusel and/or Fitzgerald or others under her
supervision, conducted a search of Perry's residence in Reading,
MA, at which time those individuals illegally searched and
seized two physical legal defense files belonging to two defense
clients of the "Law Offices of David W. Perry," without
obtaining prior Court authorization.

94.  The seizure of these records was beyond the scope of the
search warrant and AAG Dusel and/or Fitzgerald failed to take
any precautionary measures to protect the integrity of the
privileged "attorney-client" communications and "work product"
located therein.

95.  AAG Dusel and/or the on-site supervision/Defendants, failed
to instruct the Search Teams as to the scope of the items they
were authorized to seize pursuant to the search warrants.

96.  In the "Search Warrant Return" filed with the Court on
November 21, 2017, it was confirmed that Fitzgerald himself was
the person who searched for and seized the actual "Miscellaneous

Court Documents" found inside of the legal files of two of
Perry's defense clients ("Client1" and "Client2").

97. Five months after Client1's legal Court Documents were
seized, searched and violated at the hands of Johnson and/or AAG
Dusel, Client1 was sentenced and incarcerated for 15 months.
Nine months after Client2's legal Court Documents were seized,
searched and violated at the hands of Johnson and/or AAG Dusel,
Client2 was sentenced and incarcerated for 3 years.

98. AAG Dusel's search team also seized two (2) of Perry's own
physical personal legal defense files in which Perry himself was
the named defendant: without obtaining prior Court
authorization; without instituting precautionary measures to
minimize potential violations of the privileged "attorney-
client" communications; and then "returning" both files 36 hours
later to Perry's home by "dumping" both files onto Perry's
ground-level patio leaving them exposed to the elements and
scattered about Perry's outside property.

99. On the November 16, 2017, these two personal legal defense
files that belong to Perry himself were discovered blowing in
the rain and wind around Perry's balcony terrace and front yard.

100. Nowhere in the Search Warrant did the Court authorize AAG
Dusel or anyone to search and seize any legal personal defense
files belonging to Perry.

101. On December 21, 2017, according to AAG Dusel and without
any prompting, Kady "disclosed" (confessed) to AAG Dusel that he
did commit the "Kady Home Invasion" on November 30, 2016.

102. With this confession, Kady implicitly admitted that Kady
had actually lied to Law Enforcement a total of 52 times from
December 1, 2016 through March 7, 2017 when denying that he
played any role in the "Kady Home Invasion" and confirmed that
he committed "Perjury" before the Woburn District Court on March
7, 2017 when he obtained the dismissal of the complaint against
himself for "lack of probable cause."

103. Prior to Kady appearing as a witness before the grand jury
on December 21, 2017, Kady made the following
admissions/statements to AAG Dusel and/or Johnson, confirming in
Kady's own words that: Kady "left out something from his first
interview".  In other words, Kady lied to law enforcement during
a previous interview he had with law enforcement; Kady did in
fact break into and invaded Perry's home November 30, 2016; Kady
"saw the watch sitting out, so [Kady] took" Perry's watch; Kady

"saw the credit cards sitting out, so [Kady] took" Perry's
credit cards; Kady, while a resident of RES, "broke into" and
entered an RES manager's room"; Kady, while a resident of RES,
Kady "stole various items from the RES manager" into whose room
he broke into and entered; Kady "broke into the RES safe" while
a resident at RES; Kady "stole the items out of the RES safe"
while a resident at RES; Kady "broke into [Dave Perry's] office"
at RES because he was "bored and high"; Kady, when he "broke
into [Dave Perry's] office" at RES, illegally "downloaded [Dave
Perry's] files" from Perry's computer; Kady stole resident's
prescriptions and made copies of those "scripts from Whittier"
(Whittier Street Health Center).

104. "Between Kady's Interview #1, (January 26, 2017 with
Johnson), Interview #2 (February 14, 2017 with AAG Dusel and
Johnson) and Interview #3, (December 21, 2017, (with AAG Dusel,
Johnson and McHugh) Kady confessed to committing a total of
16 separate and serious crimes against Perry with Perry as his
intended victim.  AAG Dusel knew all of this before calling Kady
to testify. At no time thereafter did AAG Dusel and/or
Fitzgerald and/or Johnson and/or McHugh take any action to
protect Perry's rights as the victim of those 16 crimes, nor did
any of them make any attempt to assist Perry in getting his
stolen property back from their key witness against Perry, Kady.

105. AAG Dusel put "Witness #1" on the stand before the grand
jury and made no reference to any of Kady's crimes against
Perry, despite knowing that these crimes weighed heavily against
his witness's credibility as a prosecution witness upon whose
"credible" testimony the Court and grand jury would rely.

106. Kady's confession on December 21, 2017, confirmed that 1)
on December 1, 2016, Kady lied to RPD Officer Matthew Orr after
the Kady Home Invasion, 2) on January 24, 2017 Kady's father
lied to the RPD, 3) that on January 26, 2017, Kady lied to
Fitzgerald, 4) that on February 14, 2017, Kady lied during his
interview by AAG Dusel, 5) that on March 3, 2017, Kady Lied to
the FBI.

107. On December 21, 2017, AAG Dusel called "Witness 1"[1] to
testify before the grand jury. AAG Dusel carefully led

---

[1] For the purpose of keeping the identity of any actual grand jury witness confidential, the Plaintiff will refer to the
witness in this instance as "Witness 1".  The defendants know the identity of Witness 1. However, the Plaintiff feels
strongly that the anonymity of all actual grand jury witnesses' testimony in the courtroom must remain protected
until the Court has the opportunity to address the issue of "sealed document releases" once the parties are before the
Court.  These actions are being taken out of precaution and respect for the orders of the Suffolk  Superior Court
regarding the dissemination of certain evidence presently "under seal".

Witness 1 through his direct testimony making sure to conceal and withhold all inculpatory evidence of his crimes and his lies and his "perjury" to make certain that the grand jury perceived him to be a witness upon whose "credible" testimony the grand jury could rely.

108. AAG Dusel carefully misled the grand jury during her direct examination of Witness 1 making sure to withhold and conceal the truth about Witness 1's: 1. propensity to lie when questioned by law enforcement, 2. willingness to commit perjury and 3. to conceal that Kady admitted to breaking and entering and stealing property within Perry's home.

109. Through her direct examination of a witness, AAG Dusel intentionally led that witness to conceal his lies and crimes for the purpose of misleading the Court; withheld evidence concerning the commission of crimes against Perry; and withheld evidence that that the witness lied to enforcement 52 times.

110. Through her direct examination of a witness, AAG Dusel deliberately coached her witness to provide false or misleading testimony before the Court and knowingly engaged in conduct that caused her witness to give testimony that is false, inaccurate, and/or misleading.

111.  Throughout her entire investigation of Perry, AAG Dusel and/or Johnson misled and/or withheld from every Superior Court Judge before whom they appeared the identification of the actual crimes with which Kady was charged, namely forcible "Breaking and Entering in the Nighttime With Intent to Commit a Felony" and "Larceny of Property Over $250" from March 29, 2017 through October 2, 2019; instead they misled the Court to believe that Kady's home invasion crimes involved nothing more than the "theft of a watch" to preserve and protect the "credibility" of their key witness Kady.

112. In February 2018, AAG Dusel appeared before a tribunal and engaged in conduct manifesting a sexual orientation bias and prejudice against Perry based on his being a gay man; created a sexual orientation bias and prejudice against Perry to prejudice him before the Court; and used her authority as a prosecutor to shame and vilify Perry based solely upon Perry's homosexuality. In doing so, AAG Dusel violated Perry's basic civil rights to be free from such homophobic prejudices and biases and, when doing so caused irreparable and incalculable damage and harm to Perry as a result.

113. On March 9, 2018, Perry voluntarily met with "John W. Marshall, First Assistant Bar Counsel, Office of the Bar Counsel Board of Bar Overseers" to discuss Perry's standing before the BBO.  At the conclusion of that meeting, Perry reached an agreement with Bar Counsel which confirmed that Perry could keep active his Law License and keep open his Law Practice pending the outcome of all of Perry's criminal matters.  That BBO Agreement confirmed that Perry could continue practicing law as long as Perry's Law License remained on "Active Status" pending the resolution of Perry's active criminal matters.

114. In May 2018, AAG Dusel made defamatory statements to the public that were false, libelous and slanderous when she falsely reported that Perry would keep male addicts hooked on drugs and keep them as residents of RES where Perry would profit off them financially and have unfettered access to them for sex.  AAG Dusel made this statement knowing that it was not grounded in fact nor supported by any evidence that AAG Dusel had gathered prior to the time the statements were made. The statement was not true. AAG Dusel also made defamatory statements to the public that were false, libelous and slanderous when she falsely reported that Perry provided people with free legal services in exchange for sex and that Perry provided people with free rent in exchange for sex.

115. On February 23, 2018, AAG Dusel Appeared at Perry's First Arraignment in Suffolk Superior Court at which time several Conditions of Release were requested by AAG Dusel and subsequently Ordered by the Court; none of which included any restriction placed upon Perry that he "Not Enter any Courthouses But For His Own Defense Matters"

116. On February 23, 2018, Perry was arraigned for the first time in Suffolk Superior Court pursuant to an investigation led by AAG Dusel and/or other Defendants.  AAG Dusel Requested the following Conditions of Release:

      1.    That bail remain set at $2,500; and
      2.    That the defendant have no contact with grand jury witnesses, those who have been served with grand jury subpoenas about the grand jury investigation.

The Clerk Magistrate Ordered the following Conditions of Release:

      1.    Bail remains set at $2,500

2.      That he not have any contact with respect to the
        grand jury investigation itself. Certainly if the
        Commonwealth becomes aware that there's been
        contact with respect to the investigation,
        then bring it back and we'll address conditions of
        release and/or bail.

117. As confirmed in the Transcript of Perry's 1st Arraignment,
AAG Dusel DID NOT request, as a "Condition of Release," that
Perry be prohibited from entering any Courthouses but for his
own defense matters.

118. On May 9, 2018, AAG Dusel appeared at Perry's second
Arraignment at which time AAG Dusel requested a very specific
"Order of Conditions of Pre-Trial Release".  None of the
Conditions of Release "Requested" by AAG Dusel nor "Ordered" by
the Magistrate included any Restriction that Perry "Not Enter
any Courthouses But For His Own Defense Matters".

119. On May 9, 2018, Perry was arraigned for the second time in
Suffolk Superior Court.  AAG Dusel Requested the following
"Order of Conditions of Pre-Trial Release" (Conditions of
Release):

        1.      Cash Bail in the Amount of $100,000;
        2.      GPS Monitoring
        3.      Stay away from RES located on Washington St in
                Roxbury
        4.      Stay away and have no contact with Grand Jury
                Witnesses
        5.      Have no contact with Probation Officers in the
                Commonwealth, except his own reporting
        6.      That he be alcohol and drug free
        7.      Subject to Random Drug Screens
        8.      Surrender his U.S. Passport

        The Court Ordered the Following "Order of Conditions of
        Pre-Trial Release" (Conditions of Release):

        1.      Cash Bail in the amount of $10,000
        2.      GPS Monitoring
        3.      Curfew 7:00 pm – 7:00 am, 7 days a week
        4.      Stay away from RES on Washington Street in
                Roxbury
        5.      Stay away from all Grand Jury witnesses, except
                father and roommate
        6.      Do not apply for a new passport

120. On May 21, 2018, AAG Dusel committed fraud upon the Court when she misrepresented to Judge Connone by avowing that Perry violated his "Conditions of Release"; when she misrepresented to Judge Connone by avowing that Perry was "not allowed to appear in Court for any matter other than his own personal criminal defense matters" pursuant to one of the "Conditions of Release" placed upon Perry at his Arraignment on May 9, 2018; when she misrepresented to Judge Connone by avowing that She "Requested" that Perry must "not allowed to appear in Court for any matter other than his own personal criminal defense matters" as one of the "Conditions of Release" placed upon him at Arraignment on May 9, 2018; when she misrepresented to Judge Connone by avowing that the "Court Ordered" that Perry was "not allowed to appear in Court for any matter other than his own personal criminal defense matters" as one of the "Conditions of Release" placed upon him at Arraignment on May 9, 2018; and when she misrepresented to Judge Connone when Judge Connone directly asked AAG Dusel whether she actually "Requested" and whether the Court actually "Ordered" this "Condition of Release" during this verbal exchange:

> JUDGE CONNONE:        "that [Perry] not appear in Court on any cases other than his; is that right?"
>
> AAG DUSEL:            "That's what the Magistrate had indicated."

121. Judge Connone relied upon AAG Dusel's false representations and modified Perry's conditions of release to bar him from appearing in any Courthouse in the Commonwealth except his own cases, effectively closing his law practice.  Judge Connone thought she was simply putting in writing what was already requested and previously ordered, as was represented by AAG Dusel.

122. On May 22, 2018, the very next day, AAG Dusel refused to consent to Perry going into Wareham Court to retrieve Bail Money he posted as Surety in an unrelated matter in Wareham District Court.

123. AAG Dusel's misrepresentations caused Perry to needlessly suffer the loss of the $2,000 Bail that was forfeited due to Perry's inability to appear as Surety to collect his Bail Money in Court.

124. On May 23, 2018, the Wareham District Court defaulted Perry for his absence and forfeited Perry's $2,000 Bail Money.

125. On May 8, 2019, Perry appeared before Suffolk Superior Court Judge Heidi Brieger seeking to modify the "Condition of Release" that he "not appear in Court on Cases other than his own defense matters".

126. AAG Dusel appeared in Opposition to Perry's Motion and immediately misled Judge Brieger when she avowed that this "Condition" was included in the original "Conditions of Release" Ordered by the Magistrate at Arraignment on May 9, 2018.  AAG Dusel misled Judge Brieger when she avowed that the "Conditions of Release" were "ordered" by the Magistrate at Arraignment on May 9, 2018.

127. Judge Breiger obviously believed as true AAG Dusel's representations.  As such, Judge Brieger DENIED Perry's "Motion to Modify Conditions of Release.

128. On May 29, 2019, Perry appeared before Judge Brieger seeking reconsideration of the Court's Denial of Perry's Motion to Modify His Conditions of Release, as to that same Condition still at issue.  AAG Dusel appeared in opposition thereto telling Judge Brieger a whole new, never before heard series of lies to Judge Brieger regarding the "Condition" that Perry "Not Be Allowed to Appear in any Courthouses Other than for his Own Criminal Defense Matters." To clarify the truth as to what was actually "Requested" and "Ordered" at Arraignment regarding this Conditions of Release, Perry obtained the Official Transcript of the Arraignment held on May 9, 2018. The Official Transcript of the Arraignment confirmed that AAG Dusel had been lying to the Court at every possible opportunity on this issue.  The Transcript confirmed that AAG Dusel never "requested" and the Court never "ordered" "that Perry "Not Be Allowed to Appear in any Courthouses."

129. Even in the face of incontrovertible evidence proving that AAG Dusel had lied previously about the issue, AAG Dusel would not give in.  Rather than admit that she was "in error," AAG Dusel began telling the Court a whole new story to convince Judge Brieger that she had not been lying to the Court for the entire year prior.

130. The following exchange then took place between Judge Brieger, AAG Dusel and Attorney Goldstein:

```
THE COURT:      Allright, now on the issue of the bail
                conditions – what are they now and what
                do you want them to be?

MR. GOLDSTEIN:  We were last before Your Honor…I was
                seeking a modification…to remove a
                condition that prohibits Mr. Perry,
                who's a licensed attorney, from
                appearing in court...argued...
                on May 8, 2019.

THE COURT:      From appearing in court except for
                cases involving himself, is my
                recollection.

MR. GOLDSTEIN:  His own pending cases, of course…
                Your Honor issued a ruling denying the
                motion, holding that there weren't
                sufficiently material change of
                circumstances to modify these
                conditions...I filed a motion to
                reconsider that one issue, which is Mr.
                Perry's ability to appear in court
                other than his own cases…

                The basis of it is...that that
                particular condition was never actually
                imposed in this case at Mr. Perry's
                original bail hearing.  What happened
                at the original bail hearing was the
                Commonwealth requested certain
                conditions and the Magistrate imposed
                certain conditions.  The Commonwealth
                never requested and the magistrate
                never ordered any condition prohibiting
                Mr. Perry from appearing in court as
                required.

                On [May 21, 2018]...the Commonwealth
                had moved to revoke his bail because he
                had appeared in Bristol Superior Court…
                The Commonwealth moved to revoke his
                bail for three separate reasons...
                the third was that in making their
                argument that he – there had been this
```

order that he couldn't appear in court
other than his own cases…

On that date, the Judge, Judge Connone,
denied the Commonwealth's motion to
revoke...But it was at that time that
Judge Connone pointed out to Ms. Kelly
that there was nothing in the record
about this order prohibiting Mr. Perry
from appearing in courts as required

MR. GOLDSTEIN: And so you have the Transcript. It's in
my papers. Judge Connone inquired of
the Commonwealth, said that the Judge
wanted to be clear, was that what had
been requested by the Commonwealth at
arraignment and is that what had been
ordered, and the Commonwealth had
mistakenly told Judge Connone that,
yes, they had requested it and it had
been an order.  And so Judge Connone
then made it part of the conditions.

So the entire foundation for the
condition at issue never really had
been imposed and was only –

THE COURT:      It was imposed, but it was imposed on a
false foundation, is that what you're
saying?

MR. GOLDSTEIN: Exactly, yes.

THE COURT:      All right, Ms Kelly?

MS. KELLY:      Well, I would just say that there were
– the defendant was arraigned multiple
times in this case because we indicted
it in specific chunks.  So there were
discussions at other arraignment dates
and some of the indictments the
defendant was arraigned on in Middlesex
County which were transferred here.

So we were in a number of times in
which we had discussions with the
Magistrate about that condition, about

> the fact that we did not want him appearing on behalf of others in court. ...So I don't think it's so much as a false representation that the Commonwealth never intended that to be a condition.  I think it was not properly reflected on the docket throughout the different arraignment processes.

131. AAG Dusel presented this new story to cover up her previous misrepresentations when she avowed the following:

> 1.   "So there were discussions at other arraignment dates and some of the indictments the defendant was arraigned on in Middlesex County which were transferred here."

> 2.   "So we were in a number of times in which we had discussions with the Magistrate about that condition."

> 3.   "about the fact that we did not want him appearing on behalf of others in court."

> 4.   "So I don't think it's so much as a false representation that the Commonwealth never intended that to be a condition.  I think it was not properly reflected on the docket throughout the different arraignment processes."

132. The Middlesex Transcripts confirm that AAG Dusel misled Judge Brieger in open court on the issue of Perry "not being allowed to appear in courthouses".

> A.   The Official Middlesex Court Transcripts dated May 15, 2018 confirm that AAG Dusel committed 3 new "Acts of Fraud Upon the Court" on May 29, 2019 when she lied saying:

> 1.   "So there were discussions at other arraignment dates and some of the indictments the defendant was arraigned on in Middlesex County which were transferred here."

2.   "So we were in a number of times in which we had discussions with the Magistrate about that condition, about the fact that we did not want him appearing on behalf of others in court."

3.   "So I don't think it's so much as a false representation that the Commonwealth never intended that to be a condition.  I think it was not properly reflected on the docket throughout the different arraignment processes."

133. The May 15, 2018 Transcripts of the arraignment and bail hearing confirm that the 3 statements above were all lies.

134. At the "Middlesex Arraignment" AAG Dusel argued for and requested the following:

THE COURT:      Commonwealth, question of bail?

MS. DUSEL:      There is a question of bail. Madam Magistrate, the Commonwealth is asking for the same bail that was set in the Suffolk County case here. As I'm sure you've been able to see from the Commonwealth's statement of the case, this is a statewide grand jury case; the statewide grand jury issued 34 indictments against Mr. Perry; 25 of those were issued in Suffolk County; nine of them are Middlesex County, as you've just heard. The defendant was arraigned in Suffolk County last week; in that case, the magistrate set $10,000 cash bail with a number of conditions, including that the defendant be placed on GPS monitoring – (emphasis added)

THE COURT:      I'm sorry, what was the amount?

MS. DUSEL:      $10,000.

THE COURT:      Thank you. And what were the conditions

MS. DUSEL:      A host of conditions: GPS monitoring, with home confinement except for the 7 a.m. to 7 p.m. curfew. In addition to

that, the defendant is to stay away
from the RES sober house, which is
located on Washington Street in
Roxbury, Massachusetts. He is also
ordered to stay away and have no
contact with all grand jury witnesses,
with the exception of two individuals:
his father, Alfred Perry, and his
current roommate, Bruce Gentile. He was
also ordered not to apply for a new
passport. I provided a list of those
grand jury witnesses to counsel and I
filed a notice with Suffolk just to let
them know that that list has been
provided.

135. The remainder of the "Middlesex Arraignment" was focused on
the logistics of presenting the Commonwealth's "Motion to
Consolidate" the 9 Middlesex cases with the 25 Suffolk cases
while keeping the same "Conditions of Release" ordered in
Suffolk on May 9, 2018 to remain in place in the Middlesex case
just as AAG Dusel herself requested on the record.

136. To resolve the issue, Perry's case was immediately sent
over to Judge Kirpalani for a "Bail Hearing" on the
Commonwealth's "Motion to Consolidate" and the final agreed upon
list of Perry's "Conditions of Release".

137. Once before Judge Kirpalani, the parties discussed the
issues regarding consolidating the Middlesex case with the
Suffolk case.

138. As to the issue of any "new conditions" being requested
beyond those already set at the "Suffolk Arraignment" on May 9,
2018, the following exchange took place:

MR. PASCIUCCO:     So when we were in before the
                   magistrate, there was a question of
                   bail, and we were asking for personal
                   recognizance, I believe the
                   Commonwealth was asking for an
                   additional cash bail, based on the fact
                   solely that the motion to consolidate
                   had not been heard yet, should the
                   motion to consolidate be allowed, there
                   would be no additional cash bail and it

|                | would just be subsumed by the Suffolk case. So I don't know if that makes sense – |
|----------------|-------------------------------------------------------------------------------------|
| THE COURT:     | Ms. Dusel?                                                                          |
| MS. DUSEL:     | That's accurate, Judge. So I had prepared a motion to consolidate that the defendant is consenting to, and so kind of a procedural hiccup here where I would not be requesting an additional cash bail, but if the motion to consolidate is not first allowed, then I'm in the position where there's nothing on the Middlesex indictments. |
| MS. DUSEL:     | They do all stem from the same case, the same investigation, and they're all related, so what my intention was to have them all consolidated; have the Middlesex indictments transferred back to Suffolk County, and that's all contemplated to hearing the motion – |
| THE COURT:     | Yes.                                                                                |
| MS. DUSEL:     | -- and then the magistrate or Your Honor could set the bail that's already been set in the Suffolk case would then apply to the Middlesex indictments. |
| THE COURT:     | All right, okay. And the conditions of -- other conditions for release, have they been imposed or just other than -- is he – |
| MS. DUSEL:     | There –                                                                             |
| THE COURT:     | -- he doesn't have a GPS –                                                          |
| MS. DUSEL:     | -- he does, yes –                                                                   |
| THE COURT:     | -- all right.                                                                       |
| MS. DUSEL:     | -- with the conditions associated with that –                                      |

THE COURT:          Okay.

MS. DUSEL:          -- that's the most -

THE COURT:          So there would be no new conditions of
                    release?

MS. DUSEL:          Correct. I'm just looking at it; he
                    does have the same cash bail and
                    conditions on the Suffolk case,
                    applicable to the Middlesex
                    indictments.

139. The Court then entered the following "Bail Warnings" on the
record:

THE CLERK:          Mr. Perry, please rise. David Perry, it is
                    ordered by the court that you recognize the
                    Commonwealth personally for each future
                    appearance on the Middlesex County case;
                    failure to appear at any court date may
                    result in a $50,000 fine, five years in the
                    state prison or two-and-one half years in
                    the house of correction…

140. The Court then read the "Conditions of Release" authorized
and agreed upon by AAG Dusel herself, as indicated above:

THE CLERK:          Same conditions that were set in Suffolk
                    County are in effect on this case, which is
                    the GPS monitoring bracelet and maintaining
                    your curfew from 7 p.m. to 7 a.m., seven
                    days a week, stay away from the RES sober
                    home, and have no contact with any of the
                    grand jury witnesses with the exception of
                    your father or Mr. Bruce Gentile, and you
                    are not allowed to apply for any new
                    passports. Do you understand and agree to
                    the conditions, sir?

MR. PERRY:      Yes, sir.

141. The issue of the alleged "condition" that Perry "not be
allowed to enter any courthouses for cases other than my own
defense matters" was never requested or discussed as an issue by

AAG Dusel at any time during either appearance before the Middlesex Superior Court on May 15, 2018.

142. The two (2) Middlesex Transcripts confirm that AAG Dusel did in fact mislead to Judge Brieger three (3) times on May 29, 2019 regarding this false "condition".

143. On February 23, 2019, AAG Dusel filed the "Commonwealth's Notice of Discovery" with the Suffolk Superior Court falsely avowing that AAG Dusel... "was not aware of any promises, rewards or inducements…that are not reflected in the enclosed materials".

144. The "enclosed materials" included only one document, a 2-page Memorandum, dated February 11, 2019 ("Memorandum").  That Memorandum described some vague conditional "offer" extended to Kady regarding the "Forcible Breaking and Entering in the Nighttime with Intent to Commit a Felony and Larceny over $250" charges then pending in Woburn District Court when he was caught invading Perry's home. However, that "offer" allegedly never came to pass because the criminal case against Kady was dismissed at the Probable Cause hearing based upon, "No PC found at the Clerks Level."

145. Aside from this vague "offer" allegedly extended to Kady, AAG Dusel avowed to the Court and represented to Perry that she was "not aware" of any "promises, rewards or inducements" made to either Kady or any witness in exchange for their favorable testimony.

146. When filing the "Commonwealth's Notice of Discovery", AAG Dusel was not forthcoming when she stated that she was "not aware" of any "promises, rewards or inducements" given to any grand jury witnesses in exchange for their favorable testimony, given evidence to the contrary.  AAG Dusel's statement that she "was not aware" of any "promises, rewards or inducements" is, in and of itself, suspect, deceptive and misleading.

147. AAG Dusel produced an Attorney General's Memorandum which states the following as it relates to Kady:

> The [AG's Office] inquired of the Reading Police Department and learned that Detective Michael Fitzgerald, who serves as the police prosecutor for the department, filed an application for a complaint in relation to the then-alleged theft of a watch belonging to Mr. Perry by Witness 1.[1] At some point

during the application process, Detective Fitzgerald told Witness 1 something to the effect of that if the clerk made a finding of probable cause, he would recommend that the clerk give him "pre-trial probation," but that he could make no promises as to what the clerk's decision would be. I have heard the scenario that Detective Fitzgerald describes as pre-trial probation as "keeping the case open." In this context, pre-trial probation would have meant that had probable cause been found, the clerk would not issue the charge unless triggered by some action of Witness 1. The details of this *potential resolution* were not realized, because the clerk did not find probable cause.

148. AAG Dusel failed to reveal the role that she and "AG Investigator" and "Police Prosecutor" Fitzgerald both played in having Kady's home invasion charges dismissed for "lack of probable cause" in Woburn District Court.

149. In this Memorandum, it would appear that "the [AG's Office] inquired of the Reading Police Department and learned that Detective Michael Fitzgerald" proposed this offer of a "*potential resolution*" to Kady on his own volition, without the knowledge of AAG Dusel.

150. This "offer" appears to be but a deflection from any of the actual "promises, rewards or inducements" that AAG Dusel made to Kady in exchange for his favorable testimony at all future judicial proceedings that were not reported.

151. Upon information and belief, AAG Dusel and Fitzgerald orchestrated the dismissal of the Kady Home Invasion charges then pending against Kady on March 7, 2017 when "AG Investigator" Fitzgerald purposely failed to establish "PC at the Clerk's level" before the Woburn Court by not presenting evidence available to the RPD.

152. AAG Dusel elected not to reinstate the Kady Home Invasion charges against Kady despite Kady's unsolicited confession made directly to AAG Dusel on December 21, 2017 when he admitted that he did commit the violent Kady Home Invasion at Perry's home.

153. AAG Dusel elected not to bring perjury charges against Kady for lying before the Woburn Court on March 7, 2017 when he falsely testified, under oath, that he did NOT commit the violent home invasion at Perry's home.

154. AAG Dusel elected not to bring "Lying to Law Enforcement" Charges against Kady despite knowing that Kady "Lied to Law Enforcement" approximately 52 times from December 1, 2016 through March 7, 2017.

155. Upon information and belief, AAG Dusel was involved in providing "promises, rewards or inducements" to Devin Howell, Justin Kady, Robert Ventullo and/or Mark Dampolo in exchange for their favorable testimony at future judicial proceedings that were not disclosed pursuant to Pretrial Rule 14 to Perry and as required by applicable law.

156. All of these acts described *supra* are evidence of the covert "promises, rewards or inducements" made to Kady and others as part of AAG Dusel's and/or Fitzgerald's determined effort to "sanitize" Kady in every way possible in order to protect his credibility as her lead witness against Perry at all future judicial proceedings, including trial.

157. Under the pressures and circumstances then created by the Defendants as a direct result of their acts of misconduct committed throughout their entire investigation and prosecution of Perry, Perry pled guilty to the indictments as charged given the negative impact the Defendants' wrongful acts had upon Perry's life and upon his ability to defend himself against the totality of all of the wrongful conduct of the Defendants as set forth *supra.*

158. Perry would not have pled guilty had Kady's prosecution been properly pursued, that inculpatory evidence of Kady's crimes been preserved, the promises/inducements/rewards offered to Kady and others been disclosed, and/or the other wrongfully acts set forth above not committed by the Defendant's in violating Perry's civil rights, including but not limited to, improperly searching and seizing his personal property and legal files, effectuating the closure of his law practice/ability to practice law, and/or otherwise causing extreme pressure and duress upon him.

159. Perry has suffered emotionally, including the inability to sleep, eat, work and has had other physical manifestations resulting from the stress place upon him by the wrongful conduct of the Defendants.

160. Perry has lost money and income as set forth *supra* as a result of the wrongful conduct of the Defendants included the violation of Perry's civil rights.

### COUNT I
### (Civil Rights Violations – 42 U.S.C., Section 1983)

### A.  Material Omissions from Warrant Application and Illegal Search and Seizure (AAG Dusel, Patrick Johnson, Jack Louie, Joseph Ross, and/or Michael Fitzgerald)

161. Perry restates and incorporates herein the forgoing paragraph 1-160.

162. Under both the Fourth Amendment to the United States Constitution and Art. 14 of the Massachusetts Declaration of Rights, AAG Dusel and/or Johnson and/or Ross and/or Louie failed to perform a reasonable and/or authorized search/seizure or Perry's law office, RES, and Perry's home in Reading, MA.

163. The Defendants AAG Dusel, Patrick Johnson, Jack Louie, Joseph Ross, and/or Michael Fitzgerald acting under color of law, searched the property of David Perry, including his law office, RES and/or his home, without first serving and/or having in-hand a valid search warrant, exceeding the scope of said warrant, by searching David Perry's law office without authority, and/or by removing and seizing items not allowed by said search warrants, including legal files.

164. The search performed by these Defendants was unreasonable, not authorized, premature and/or beyond the scope allowed.

165. The search warrants were issued based upon applications submitted by Johnson and/or other Defendants.

166. In the warrant affidavits, Johnson made false statements and/or omissions that created a falsehood.

167. Johnson made the false statements and/or omissions either deliberately, or with a reckless disregard for the truth.

168.  Those false statements or omissions made by Johnson were material, or necessary, to the issuance of search warrants and an arrest warrant for Perry.

169. The submission of affidavits to the Court containing material omissions and to obtain an arrest warrant for Perry caused harm and damages to Perry.

170.  The unreasonable and/or unauthorized search and seizure by these Defendants caused harm and damages to David Perry by impacting his law practice and his ability to earn a living, revealing privileged information of his own and clients, causing mental anguish and emotional harm, having RES and his law practice entered without a valid warrant being in-hand and/or presented by the Defendants prior to entry and search, and by exceeding the scope and authority of said warrant, invading the privacy and rights of David Perry.

171.  Perry has suffered harm and damages resulting from fear, worry, loss of sleep, shock, humiliation, embarrassment, distrust of law enforcement, unlawful entry, mental anguish and suffering.

    WHEREFORE, Plaintiff seeks any and all compensable and/or actual and punitive damages, including attorney fees, interest and costs, as a result of AAG Dusel, Patrick Johnson, Jack Louie, Joseph Ross, and/or Michael Fitzgerald's wrongful conduct and the violation of Section 1983 and Perry's civil rights in an amount to be proven at trial.

### B.  Due Process Violations/14th Amendment – Destruction of Evidence, Failure to Prosecute Kady, Fraud Upon the Court, and Brady Disclosures/Pretrial Disclosures (AAG Dusel, Johnson, Michael Fitzgerald and Michelle Halloran)

172. Perry restates and incorporates herein the forgoing paragraph 1-171.

173.  As set forth *supra*, the Defendants AAG Dusel, Fitzgerald and/or Halloran did destroy exculpatory or impeachment evidence that should have been available to Perry as to the Kady crimes.

174.  AAG Dusel and/or Fitzgerald directed the destruction of exculpatory or impeachment evidence of the Kady crimes in the RPD evidence locker, including photographs, and therefore are liable for the wrongful conduct.

175.  As set forth *supra*, the Defendants AAG Dusel, Johnson, and Fitzgerald did fail to present inculpatory evidence, prosecute and/or press charges against Kady to protect Perry's civil rights.

176.  As set forth *supra*, the Defendants AAG Dusel and/or Fitzgerald did fail to disclose to Perry evidence of promises, awards or inducements made to Kady and others.

177.  AAG Dusel did mislead and commit fraud upon the Court, resulting in the deprivation of and violation of Perry's rights to due process of law through fair treatment through the judicial system, depriving him of his ability to practice law.

178.  Perry suffered prejudice as a result of the Defendants' wrongful conduct and due process violations.

179.  Perry has suffered harm and damages resulting from the destruction of evidence and promises/inducement provided to Kady and the fraud upon the Court, through incurring unnecessary legal fees, losing the ability to practice law, and by not being able to obtain or seek justice, restitution and/or reimbursement from Kady for the crimes he committed against Perry.

WHEREFORE, Plaintiff seeks any and all compensable and/or actual and punitive damages, including attorney fees, interest and costs, as a result of AAG Dusel, Patrick Johnson, Michelle Halloran and/or Michael Fitzgerald's wrongful conduct and the violation of Section 1983 and/or Perry's civil rights in an amount to be proven at trial.

### C.  Inadequate training, supervision and/or failure to adopt a policy — Destruction of Evidence, Search of Perry's Home, and Fitzgerald's Conflict of Interest (Town of Reading and Michael Fitzgerald)

180. Perry restates and incorporates herein the forgoing paragraph 1-179.

181. The Town of Reading employed Michael Fitzgerald as a Detective and Police Prosecutor who violated Perry's civil rights as set forth above.

182. The Town of Reading did fail as a matter of policy or custom to train, supervise and or adopt a needed policy with respect to the handling of and/or destruction of evidence, searches conducted by the police, and conflicts created by dual or multiple roles occupied by police in prosecuting/presenting crimes of victims while investigating crimes alleged to have been committed by said victims, in this case Perry.

183.  The Town of Reading was deliberately indifferent to the fact that a violation of Perry's rights under the Fourth and Fourteenth Amendment was a highly predictable consequence of the inadequate training, supervision and/or failure to adopt a needed policy.

184.  Fitzgerald acted in a conflicting role and intentionally failed to protect Perry's rights with respect to the crimes committed by Kady, to the harm and detriment of Perry, as set forth above.

     WHEREFORE, Plaintiff seeks any and all compensable and/or actual damages, including attorney fees, interest and costs, as a result of the Town of Reading and/or Fitzgerald's wrongful conduct and the violation of Section 1983 and/or Perry's civil rights in an amount to be proven at trial.

### COUNT II
### (Defamation)

185. Perry restates and incorporates herein the forgoing paragraph 1-184.

186. AAG Dusel did intentionally defame Perry by making public statements that were false and not supported by facts known to her and/or negligently made, to intentionally harm and discredit Perry personally and in his business endeavors, including the operation of RES and his laws practice.

187.  Perry did suffer actual harm, emotional and otherwise, as a result of AAG Dusel's defamatory statements concerning Perry.

     WHEREFORE, Plaintiff seeks any and all presumed, compensable and/or actual damages as against AAG Dusel for said defamation, in an amount to be proven at trial.

### COUNT III
### (Intentional Infliction of Emotional Distress)

188. Perry restates and incorporates herein the forgoing paragraph 1-187.

189.  AAG Dusel did unlawfully, maliciously, and without justification, intended to inflict emotional distress upon Perry, or knew or should have known that such emotional distress was the likely result of her conduct, set forth above.

190.  The conduct of AAG Dusel was extreme, outrageous, and utterly intolerable in a civilized community.

191.  As a direct and proximate cause of AAG Dusel's conduct, Perry suffered great and severe emotional harm and distress, of a nature that no reasonable person could be expected to endure.

WHEREFORE, Plaintiff seeks any and all presumed, compensable and/or actual damages as against AAG Dusel for said intentional infliction of emotional distress, in an amount to be proven at trial.

Plaintiff requests a trial by jury.

Dated this 20th day of August 2021.

Respectfully submitted,
For the Plaintiff,

*/s/Andrew J. Tine*
Law Office of Andrew J. Tine
BBO633639
18 Maple Avenue, #267
Barrington, RI 02806
atine@tinelaw.com
401-396-9002 – tel.